IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| United States of America | Case No.: 22-cr-50026 |
|---|---|
| v. | Judge Iain D. Johnston |
| Orentho Hurd | |

**MEMORANDUM OPINION AND ORDER**

Defendant Orentho Hurd moves to suppress evidence retrieved in a search of his girlfriend's home, because he argues that his girlfriend's consent, though voluntary, was the fruit of a poisonous tree. For the reasons explained below, Hurd's motion is denied.

I. **Background**

Based on information provided to a state-court judge, an arrest warrant for Defendant Orentho Hurd was signed and issued in August 2021. Dkt. 107 at 11; Dkt. 103. Without challenging the validity of the arrest warrant, Hurd moves to suppress evidence found at his girlfriend Marissa Martin's apartment shortly after his arrest. The Court held an evidentiary hearing on this motion, where three of the arresting officers testified about the incident. The following facts are adopted from the undisputed testimony of Detective Nolan Walker, Officer D'evyron Boone, and former officer Joseph Stevens. *See generally* Dkt. 107. Martin and Hurd were also present at the hearing, but neither testified.

1

At approximately 7:00am, Rockford police and federal task force officers arrived at Martin's apartment with a warrant for Hurd's arrest. *Id.* at 28:9–12. The officers promptly knocked and announced themselves as police and yelled for Hurd to come out of the apartment. *Id.* As they continued banging on the front door, officers heard "scurrying" noises, moving from one side of the residence to the other. *Id.* at 100:22–23. The officers perceived this sound as multiple people running frantically around the home, but, throughout the scurrying, no one responded to the officers. *Id.* at 17:19–24. After approximately 90 seconds—with still no response from inside the home—officers broke down Martin's front door to gain entry into the residence. *Id.* 36:11–12. Though the officers' exact estimates ranged, less than two minutes passed from their first knock to the time they breached the door. *Id.* at 100:22–23. In that time, officers never stated that they had an arrest warrant. *Id.* at 32:1–6.

After breaching the door, the officers quickly located Hurd descending a flight of stairs immediately inside the threshold. *Id.* at 17:17–18; 16:3–10. Several officers arrested Hurd inside, while others conducted a protective sweep of the apartment's lower level. *Id.* at 18:2–6; 36:11–12. Hurd doesn't contend that the officers improperly searched for or located contraband during the protective sweep. In fact, the sweep lasted for approximately one minute while officers searched for dangerous individuals hiding in the home. *Id.* at 36:20–22. By that time, law enforcement possessed evidence, including a video recording, of Hurd engaging in criminal activity, such as discharging a firearm in public. *Id.* at 87:1–11. The officers also testified that they believed Hurd was involved with a gang and they were concerned

2

by the sounds of scurrying, which indicated that multiple people may be hiding in the home. *See, e.g., id.* at 89:2–92:18; 93:15-24.; 17:19–25. Ultimately, however, this initial sweep revealed no people and no contraband.

After completing the protective sweep, several officers remained inside to speak with Martin. *Id.* at 36:10–12. One officer recalled that he first encountered Martin in the living room, *id.* at 108:16–18, and another added that Martin asked a neighbor to supervise her child at some point. *Id.* at 114: 25–115: 1. The officers also recall that they spoke with Martin, secured her verbal consent to search, and returned to a squad car to locate a written consent form. *Id.* at 137: 20–21; 39:16–24. About eleven minutes after the initial entry, Martin granted the officers written consent to search her apartment, and the officers proceeded to the upper level of the apartment. *Id.* at 113:11–22. Only after obtaining Martin's consent did officers discover any incriminating evidence against Hurd. *Id.* at 43:24–44:4; 198:17–18.

**II.     Analysis**

Hurd moves to suppress the evidence found during the consent search of Martin's apartment because, in his view, Martin's consent is the fruit of a poisonous tree. As a fundamental premise to this argument, Hurd contends that the officers violated the Constitution in four ways. First, Hurd argues there was an insufficient basis to conduct a protective sweep on the first floor of Martin's apartment. Second, Hurd contends that officers failed to announce that they were there to arrest him. Third, according to Hurd, the officers didn't give him sufficient time to open the door before it was breached. And, finally, Hurd asserts that after the protective sweep

3

found no dangerous individuals, the officers were required to physically leave Martin's residence (perhaps, just stepping outside the threshold of the doorway) for them to ask her for consent to search her home.

From this, Hurd reasons that Martin's consent to search was tainted by the officers' allegedly unlawful entry and continued presence in her home. As Hurd acknowledges, though, none of the alleged Fourth Amendment violations independently justify suppression of the evidence. *See, e.g.*, *United States v. Langford*, 314 F.3d 892, 895 (7th Cir. 2002); *Maryland v. Buie*, 494 U.S. 325, 325 (1990); *United States v. Leon*, 468 U.S. 897, 923 (1984). He primarily argues that valid consent to search must be sufficiently attenuated from the taint of any illegal entry into a home under *Brown v. Illinois*, 422 U.S. 580, 603-04. Attenuation is determined, in turn, using the *Brown* factors: "(1) the temporal proximity of the illegal entry and the consent, (2) the presence of intervening circumstances, and, particularly, (3) the purpose and flagrancy of the official misconduct." *United States v. Robeles-Ortega*, 348 F.3d 679, 681 (7th Cir. 2003) (citing *Brown v. Illinois*, 422 U.S. at 603-04) (cleaned up).

The Court isn't so sure that *Brown* applies,[1] but in the interest of efficiency, it takes Hurd at his word. Even assuming the officers' conduct violates the Fourth Amendment, the taint of those violations quickly dissipated throughout the episode.

---

[1] As a threshold matter, it's unclear that the alleged officer misconduct violates the Fourth Amendment in any way. But even assuming that the officers' behavior was constitutionally suspect, Hurd never explained how that behavior caused Martin to consent. *See United States v. Meece*, 580 F.3d 616, 619 (7th Cir. 2009); *United States v. Swift*, 220 F.3d 502, 507

4

a. The *Brown* factors generally

The *Brown* factors overwhelmingly favor the government in this case. In *Rawlings v. Kentucky*, the Court jointly considered temporal proximity and intervening circumstances, finding that relaxed conditions of detention—such as staying at one's home—offset an otherwise quantitively "short" passage of time. 448 U.S. 98, 99 (1980); s*ee also United States v. Conrad*, 673 F.3d 728, 735 (7th Cir. 2012) (valid consent even though police illegally entered the curtilage of a home, because the officers remained "professional" inside the home and engaged in a reasonable search). These factors jointly weighed against suppression in *Rawlings*, as they do in this case. Officers professionally adhered to their proper law enforcement purpose on the premises while they communicated with Martin about the situation. There is no suggestion that Martin's freedom to move was restricted in any way. Instead, Martin was held in relaxed and congenial conditions during a short investigatory detention; she was allowed to speak with officers about the situation and arrange for her neighbor to safely retrieve her son from the home.

Though the first two factors sufficiently attenuate Martin's consent from the alleged officer misconduct, the third factor is decisive for Hurd's motion. None of the

---

(7th Cir. 2000) (the fruit of the poisonous tree only warrants the exclusion of evidence obtained *as a result* of an illegal search or seizure). For instance, even assuming that the officers violated the Fourth Amendment by not announcing that they were there to arrest Hurd, there is simply no showing that this violation caused Martin to give consent to search the home. Indeed, under the facts of this case, it stretches the imagination beyond the breaking point to make that contention. And the same causal problems lie with each of the alleged violations. But since it ultimately makes no difference to the outcome of Hurd's motion, the Court need not belabor the point.

alleged violations are so flagrant as to justify suppression. Purpose and flagrancy are universally the "most important" considerations under *Brown* because they are directly tied to the rationale underlying the exclusionary rule. *Conrad*, 673 F.3d at 735; *United States v. Reed*, 349 F.3d 457, 463 (7th Cir. 2003). According to the undisputed testimony in this case, officers entered the home in good-faith and for the legitimate law enforcement purpose of effecting a valid arrest warrant. Perhaps Hurd contends that the officers' purpose weighs in favor of suppression because they were on the property for the sole purpose of extracting Martin's consent. But that argument is directly contradicted by the officers' testimony. To the best of the officers' recollection, it took approximately eleven minutes to speak with Martin, return to a squad car, and obtain her consent. These are undoubtedly legitimate law enforcement activities.

On the matter of flagrancy, the Court asks whether the alleged violations would ordinarily warrant suppression under the exclusionary rule. And, on that point, the Court is duty-bound by well-settled precedent that an officer's negligence in effecting a warrant doesn't necessarily lead to suppression. *E.g. McDaniel v. Polley*, 847 F.3d 887, 896 (7th Cir. 2017); *Herring v. United States*, 555 U.S. 135, 144 (2009). Suppression is neither a right nor a remedy for Fourth Amendment violations. *United States v. Davis*, 44 F.4th 685, 689–90 (7th Cir. 2022). Instead, courts only suppress evidence when the deterrence benefits outweigh the social costs. *E.g. Leon*, 468 U.S. at 923. When viewed through this lens, Hurd's motion loses all ground. Hurd acknowledges that Martin's consent was voluntary and that the

6

officers had a valid arrest warrant. He doesn't contend that officers used malicious, forceful, or coercive tactics while effecting the arrest warrant. Nor could he.

      b. Purpose and flagrancy of each alleged violation

Beyond the technical Fourth Amendment violations alleged in Hurd's motion, there is simply no evidence that officers wrongfully extracted Martin's consent. Nor do any of the alleged violations create that inference. Consider, for instance, Hurd's argument regarding the protective sweep. In his view, officers weren't entitled to sweep the apartment because they had already arrested and subdued Hurd. But standing alone, that doesn't suggest that the officers acted in bad faith. *See United States v. Contreras*, 820 F.3d 255, 268 (7th Cir. 2016). Hurd never suggested that the officers opened any containers or improperly searched for evidence during the brief sweep. And if the officers were acting maliciously, why would they limit their search to one minute, or stop at the first floor? Both common sense and undisputed testimony counsel that the protective sweep was no longer than necessary to promote officer safety.

The Court is similarly hard-pressed to believe that the officers willfully intruded on Fourth Amendment protections by failing to explicitly use the phrase "arrest warrant" before knocking down Martin's door. To the contrary, officers substantially complied with the formal requirements of effecting the warrant: They knocked forcefully and repeatedly on the front door, announced themselves as police, and repeatedly yelled for Hurd to come out. On this front, Hurd's only complaint is

7

procedural. Suppressing lawfully obtained evidence based on such a trivial misstep is like killing a mosquito with a bazooka.

Hurd's third argument, regarding a reasonable timeframe to surrender, fares no better. Whereas Hurd insists that 90 seconds wasn't enough time to dress and come downstairs, a *Brown* analysis only cares about the officers' perspective. And in that context, 90 seconds is a long time to stand idly, hoping that a notoriously dangerous suspect surrenders without incident to a federal task force. Under the stress of the situation, it's certainly possible that officers miscalculated the amount of time necessary for Hurd to dress and descend the stairs. But, at risk of sounding repetitive at this point, that miscalculation doesn't prove malintent or flagrancy. In fact, the Seventh Circuit addressed these arguments in *United States v. Espinoza*, 256 F.3d 718, 725 (7th Cir. 2001), when it affirmed the denial of Espinoza's motion to suppress evidence recovered in a consent search of a two-story duplex. Like Hurd, Espinoza argued that officers didn't give him a reasonable opportunity to descend and surrender before they breached the front door. *Id.* But the Seventh Circuit rejected this argument without confronting the constitutional question. More simply, the Court reasoned that the officers' conduct didn't harm the defendant's protected interests. *Id.* And, importantly, the officers in *Espinoza* only waited five seconds before breaching the front door. Though reasonable minds may disagree on whether 90 seconds was a reasonable opportunity for Hurd to surrender, there's no doubt that the conduct in this case was less culpable than in *Espinoza*.

8

Finally, Hurd argues that officers weren't entitled to seek Martin's consent from inside her apartment. But even if Hurd is correct that officers should've stood with their toes over the threshold, there's no reason to believe officers acted in bad faith simply by failing to perform this ritual. What's more, there's no reason to believe they're even aware of the requirement. *See Kentucky v. King*, 563 U.S. 452, 463 (2011); *I.N.S. v. Delgado*, 466 U.S. 210, 217 n.5 (1984) (when officers are present pursuant to a warrant, "the same considerations attending contacts between the police and citizens in public places should apply" to all consent-based encounters). Martin never asked the officers to leave her home, and the officers' collective testimony characterizes the encounter as a brief consensual conversation about the circumstances. Taken together, these facts and factors show that Martin's eventual consent was fairly attenuated from the officers' allegedly unlawful presence in her home.

### III. Conclusion

For the reasons stated above, Hurd's motion to suppress the evidence recovered from Martin's apartment is denied.

Entered: March 7, 2024          By:_____
                                Iain D. Johnston
                                U.S. District Judge

9